RECEIVED

AUG 2 1 2012

TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE, LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

REBECCA MARTEL

VERSUS

EVANGELINE PARISH SCHOOL BOARD

CIVIL ACTION NO.: 10-CV-00878

JUDGE DOHERTY

MAGISTRATE JUDGE HANNA

## MEMORANDUM RULING

Currently pending before the Court is a Motion for Summary Judgment [Doc. 15], filed on behalf of defendant, Evangeline Parish School Board ("School Board"). By way of its motion, defendant seeks dismissal with prejudice of all claims brought against it by plaintiff. For the following reasons, the motion is GRANTED IN PART and DENIED IN PART.

**I.      Background**

Plaintiff filed suit in this Court, asserting the School Board has violated the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*, and the "Louisiana Employment Discrimination Law" ("LEDA"), La. R.S. 23:321-325. Specifically, plaintiff alleges the School Board unlawfully discriminated against her by: (1) failing to provide reasonable accommodations, (2) creating a hostile work environment, and (3) subjecting plaintiff to disparate treatment.

The following facts are uncontested[1]:

1. Rebecca Martel is a teacher certified to teach grades K-8.

2. Martel suffers from a physical disability due to an incident occurring in approximately 1991 and is essentially confined to a wheelchair/motorized scooter,

---

[1]*See* LR56.1; LR56.2.

1

although she can walk short distances.[2]

3.  Martel can perform activities of daily living, including toileting, cleaning her house, driving, etc., but needs help with cooking due to her inability to accurately feel temperatures.

4.  In August 2007, Martel applied for employment as a teacher with the Evangeline Parish School Board.

5.  When Martel came in to the Central Office to file an application and [sic], at that time, Mr. Lombas [Evangiline Parish School Board Personnel Advisor] interviewed her with regard to open elementary teaching positions, including one at Mamou Elementary School.

. . . .

7.  Mr. Lombas sent Martel to speak with Cindy Ardoin, principal of Mamou Elementary School, about an opening for a 3d grade teacher at that school.

8.  Ms. Ardoin met with Martel at the school and discussed the particulars of the job. . . .

9.  During this meeting, Ms. Ardoin also asked Martel if she would need anything in order to do the job given her physical condition. . . .

. . . .

11.  Ms. Ardoin informed Mr. Lombas that she believed Martel would be a good fit for the school at which time he checked her references with another school system for whom she had worked.

12.  Martel's references did not indicate any issues with job performance, so Mr. Lombas submitted Martel to the School Board for approval for hire, which it did in August 2007.

13.  The classroom to which she assigned Martel was in the same area as the other 3d grade classrooms and was equal distance from the two (2) restrooms available, but Martel, as well as her students, was allowed to use the kindergarten

---

[2]Plaintiff testified she is disabled due to a spinal cord injury caused by a gunshot wound. [Doc. 15-1, pp. 15-16] She stated her current condition "would be listed as paraplegic," although in the past, she was classified as a quadriplegic. [Id.] Currently, she has movement in her left side, although it is impaired. [Id.]

restroom, which was newer and wheelchair accessible.

. . . .

15.  Ms. Ardoin noticed that Martel was having difficulty negotiating over some of the thresholds into the 4th grade building where the cafeteria, library and teachers' lounge are located, so she had the thresholds removed to allow her easier access.

16.  Ms. Ardoin also allowed Martel to simply wave to the school secretary as she came in in the mornings and the secretary would sign her in since the office is small and she would have difficulty getting to the sign-in sheet.

17.  Ms. Ardoin submitted a work order [to the School Board] for the construction of a covered parking space for Martel, but . . . [the request was not approved].

18.  Martel was able to park in one of the only two spots located close to the school building which provided her with much closer proximity to the building than the other teachers who had to park across the driveway almost at the street.

19.  In October 2007, Martel's teaching performance, in compliance with School Board policy, was observed by the assistant principal, Sharline Perrodin, who noted some concerns.

20.  After the observation, Ms. Perrodin discussed her concerns with Ms. Ardoin, who then also observed Martel.

21.  Ms. Ardoin then began conducting walk-through observations of Martel.

22.  Following these observations, Ms. Ardoin determined that Martel should possibly be placed under an Intensive Assistance Plan (IAP), which is designed to assist a teacher in areas of job performance that are unsatisfactory or needs improvement.

23.  Ms. Ardoin consulted with Mr. Lombas regarding this, who, after observing Martel's performance, concurred in Ms. Ardoin's determination.

24.  The decision to place Martel under an IAP was made in January 2008 and implemented beginning in February. The first phase continued through April 1, 2008 at which time it was determined that, while Martel had improved in several areas, there were still some areas that continued to need improvement.

25.  At that time, a 2d phase of the IAP was developed and implemented which lasted until the end of the school year in May 2008.

26.  On April 1, 2008, Martel wrote a letter to Ms. Ardoin regarding specific accommodations she needed in order to perform her job, including the need for closer proximity to a restroom and a covered parking space.  She also complained about reprimands she had received for not attending meetings where she could not access the room in her wheelchair.  She copied the EEOC on the letter.

27.  The School Board did not receive notice of the filing of a charge of discrimination by Martel until April 21, 2008.

28.  Ms. Ardoin responded to Martel's letter on April 14, 2008 and reminded her of the denial of the work order submitted at the beginning of the school year for the covered parking, as well as noted that this was the first she had heard of an issue with restroom location.

29.  Ms. Ardoin, in response to Martel's request, moved [Martel's] classroom closer to the [restroom] . . . .

30.  Ms. Ardoin also purchased a large beach umbrella which someone on the staff used to cover Martel as she entered and exited her vehicle on rainy days.

31.  At the end of the school year, Martel was transferred to teach 5th grade at Mamou High School, which housed both the middle and high schools.

32.  This was done in response to a decrease in enrollment at Mamou Elementary and, since Martel was the last hired there, she was the one transferred.

33.  There was no covered parking at Mamou High School either, but the school principal allowed Martel to park under a sidewalk overhang.

34.  A restroom located next to her classroom was also retrofitted to allow for wheelchair access.

35.  Martel remained at the Mamou High campus for the 2008/2009 and 2009/2010 school years.

36.  In August 2010, Martel was again transferred, this time to Ville Platte Elementary School where she was assigned to teach kindergarten.

37.  At that time, the spending freeze initiated through the deseg litigation had

been lifted and a covered parking space was constructed for Martel's use.[3]

38.  Martel remains to this day employed by the School Board as a teacher.

39.  [At Mamou Elementary School] [c]opy paper was kept in the assistant principal's office because there was room to store it there, which also allowed the administration to have some control over how it went out, as well as that there was no other place to keep the paper.

. . . .

41.  Martel was written up for testing violations during the LEAP and I-LEAP testing period for the 2008/2009 school year.

. . . .

43.  Ms. Ardoin is the one who requested Mr. Lombas to recommend Martel for hire, as well as the one who determined that Martel needed to be placed in intensive assistance.

44.  There was no classroom on the campus of Mamou Elementary that had its own restroom, save one to which special education students were assigned who had issues with toileting requiring direct access to a restroom and water.

[Doc. 15-9; *see also* Doc. 18-1]

The following facts are in dispute:

A.      Whether or not, at plaintiff's initial interview with Mr. Lombas, she was asked if she needed any accommodations in order to perform the job of a teacher, and, if she was so asked, whether or not she responded that she only needed regular restroom breaks. [Doc. 18-1, ¶ 1; Doc. 15-9, ¶ 6]

B.      Whether plaintiff, at her first meeting with Ms. Ardoin, "specifically requested accommodations regarding immediate access to bathrooms and covered parking." [Doc. 18-1, ¶ 2; Doc. 15-9, ¶ 9]

C.      Whether or not plaintiff advised any school official, prior to April 2008, that the distance from her classroom to the restroom was too great. [Doc. 18-1, ¶ 3; Doc. 15-

---

[3]At the time of Ms. Martel's hiring, the School Board was constrained in taking certain actions and making certain expenditures, as it was subject to judicial oversight due to ongoing desegregation litigation. *See Graham v. Evangeline Parish School Board*, Civil Action No. 65-11053 (Melançon, J.).

9, ¶ 14]

(C)(1). Whether or not at plaintiff's second meeting with Ms. Ardoin, shortly after she was hired in August 2007, when she was shown the classroom to which she would be assigned, plaintiff advised Ms. Ardoin "that the classroom really needed to be closer to a bathroom." [Doc. 18-1, ¶ 3; Doc. 15-9, ¶ 14]

    (C)(1)(a). Whether or not Ms. Ardoin responded that "there was no available space," with no further discussion. [Doc. 18-1, ¶ 4; Doc. 15-9, ¶ 14]

    (C)(1)(b). Whether or not plaintiff again asked Ms. Ardoin if she could be moved to a classroom closer to a restroom in October and December of 2007, and if so, whether Ms. Ardoin responded, on both occasions, that nothing was available. [Doc. 18-1, ¶¶ 6, 7; Doc. 15-9, ¶ 14]

D.    Whether or not the School Board was prevented from constructing covered parking for plaintiff, while she was employed at Mamou Elementary School,  due to a spending freeze contained within the desegregation order. [Doc. 18-1, ¶¶ 14, 15; Doc. 15-9, ¶ 45]

E.    Whether or not plaintiff was unable to access copy paper on at least two occasions. [Doc. 18-1, ¶¶ 17-19; Doc. 15-9, ¶¶ 39-40]

F.    Whether or not the modifications to the "popsicle stick" method of calling on students, made to accommodate plaintiff's disability, were insufficient to allow plaintiff to implement the "popsicle stick" method in light of her disability.[4] [Doc. 18-1, ¶¶ 20-22; Doc. 15-9, ¶ 42]

---

[4]The "popsicle stick method" is a system utilized to ensure a teacher calls on all of their students during class. [Doc. 18-3, p.18] All students' names are written on popsicle sticks, the sticks are placed in a can, the teacher pulls a popsicle stick and calls upon the student whose name appears on the stick.  The teacher then places the popsicle stick elsewhere, thereby ensuring every student is "involved in the lesson." [Doc. 15-5, pp.12-13] According to Ms. Ardoin, the popsicle stick method "was one of the activities that we suggested that she use" while plaintiff was in the Intensive Assistance Program. [Id.] Ms. Ardoin further testified she noticed Ms. Martel was having a hard time utilizing the method and maneuvering around the classroom in her scooter at the same time, so Ms. Ardoin "made a little pouch with the velcro with some little pockets" that plaintiff could attach to the arm of her wheelchair, in lieu of using a can. [Id. at 13]

## II.    Summary Judgment Standard

A party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

Fed. R. Civ. Proc. 56(a).  As summarized by the Fifth Circuit in Lindsey v. Sears Roebuck and Co., 16 F.3d 616, 618 (5th Cir. 1994):

When seeking summary judgment, the movant bears the initial responsibility of demonstrating the absence of an issue of material fact with respect to those issues on which the movant bears the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317 (1986). However, where the non-movant bears the burden of proof at trial, the movant may merely point to an absence of evidence, thus shifting to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial. Id. at 322; see also, Moody v. Jefferson Parish School Board, 2 F.3d 604, 606 (5th Cir.1993); Duplantis v. Shell Offshore, Inc., 948 F.2d 187, 190 (5th Cir.1991). Only when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party" is a full trial on the merits warranted. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

The Supreme Court has instructed:

[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Where no such showing is made, "[t]he moving party is entitled to a judgment as a matter of law because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof."

Lujan v. National Wildlife Federation, 497 U.S. 871, 884 (1990)(quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)).  The Fifth Circuit has further elaborated:

[The parties'] burden is not satisfied with 'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence. We resolve factual controversies in favor of the nonmoving party, but only when there is an actual controversy, that is, when both

7

parties have submitted evidence of contradictory facts. We do not, however, in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts. ...[S]ummary judgment is appropriate in any case where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant.

Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)(citations and internal quotations omitted).

Finally, in evaluating evidence to determine whether a factual dispute exists, "credibility determinations are not part of the summary judgment analysis." Id. To the contrary, in reviewing all the evidence, the court must disregard all evidence favorable to the moving party that the jury is not required to believe, and should give credence to the evidence favoring the nonmoving party, as well as that evidence supporting the moving party that is uncontradicted and unimpeached. Roberts v. Cardinal Servs., 266 F.3d 368, 373 (5th Cir. 2001).

**III.  Applicable Law**

As a preliminary matter, the Court notes plaintiff's claims are brought by way of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*, and the "Louisiana Employment Discrimination Law," La. R.S. 23:301, *et seq.* By way of its motion, defendant seeks dismissal of all claims brought by plaintiff.  However, in her memorandum in opposition to defendant's motion, plaintiff provides no argument in support of her claims made by way of the LEDA, nor does she mention the LEDA at all.  Accordingly, those claims have likely been waived. *See e.g. Windhauser v. Board of Supervisors for Louisiana State University & Agricultural and Mechanical College*, 360 Fed.Appx. 562, 565 (5th Cir. 2010). Regardless, claims asserted under the LEDA are analyzed using the same framework and precedent as the ADA claims, and thus, the same result will flow.  *See e.g. Labit v. Akzo-Nobel Fault, Inc.*, 209 F.3d 719, n. 1 (5th Cir. 2000)

8

("Louisiana courts apply federal jurisprudence to assess [disability] discrimination claims under La. R.S. 23:301 et seq.; thus, we will consider the claims simultaneously"); *Lindsey v. Foti*, 81 So.2d 41, 44 (La.App. 1 Cir. 2011).

"The ADA is a federal anti-discrimination statute designed to remove barriers which prevent qualified individuals with disabilities from enjoying the same employment opportunities that are available to persons without disabilities." *Taylor v. Principal Financial Group, Inc.*, 93 F.3d 155, 161 (5th Cir. 1996). The ADA prohibits discrimination in employment "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a)(West 2008)[5]. The act defines a "qualified individual" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8)(West 2008). "Disability" is defined, in pertinent part, as "a physical or mental impairment that substantially limits one or more major life activities of such individual." 42 U.S.C. § 12102(2)(A) (West 2008).

> [T]he term "discriminate" includes—
>
> > (1) limiting, segregating, or classifying a job applicant or employee in a way that adversely affects the opportunities or status of such applicant or

---

[5]In 2008 (and effective January 1, 2009), Congress passed the Americans with Disabilities Act Amendments Act (ADAAA), essentially superceding the Supreme Court's prior, narrow construction of the term "disability." The Fifth Circuit has held Congress did not intend the ADAAA to apply retroactively. *Carmona v. Southwest Airlines Co.* 604 F.3d 848, 857 (5th Cir. 2010). As the alleged discriminatory events in this matter occurred prior to the effective date of the ADAAA, this Court will apply the law in effect at the time of the alleged conduct, without noting each instance in which it has been superceded by statute. *See id.*; *Kemp v. Holder*, 610 F.3d 231. That said, the amendments would not appear to effect the resolution of this particular matter.

employee because of the disability of such applicant or employee;

. . . .

(5)(A) not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity . . . .

42 U.S.C.A. § 12112 (West 2008).

The term "reasonable accommodation" may include--

(A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and

(B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

42 U.S.C.A. § 12111(9) (West 2008).

The term "undue hardship" means an action requiring significant difficulty or expense, when considered in light of the [following] factors . . .

(i) the nature and cost of the accommodation needed under this chapter;

(ii) the overall financial resources of the facility or facilities involved in the provision of the reasonable accommodation; the number of persons employed at such facility; the effect on expenses and resources, or the impact otherwise of such accommodation upon the operation of the facility;

(iii) the overall financial resources of the covered entity; the overall size of the business of a covered entity with respect to the number of its employees; the number, type, and location of its facilities; and

(iv) the type of operation or operations of the covered entity, including the composition, structure, and functions of the workforce of such entity; the geographic separateness, administrative, or fiscal relationship of the facility or facilities in question to the covered entity.

42 U.S.C.A. § 12111(10)(West 2008).

"A plaintiff may establish a claim of disability discrimination by presenting direct evidence of discrimination." *Taylor* at 162.  Absent direct evidence of discriminatory intent, as is typically the case, proof via circumstantial evidence may be utilized, using the framework set forth in *McDonnell Douglas Corp v. Green*, 411 U.S. 792 (1973).  *Taylor* at 162; *see also Russell v. McKinney Hosp. Venture*, 235 F.3d 219,  222 (5th Cir. 2000).  Under the McDonnell *Douglas* analysis, a plaintiff must first establish a prima facie case of unlawful disability discrimination. *Taylor* at 162; *see also Gowesky v. Singing River Hosp. Systems*, 321 F.3d 503, 511 (5th Cir. 2003). "Once the plaintiff makes his prima facie showing, the burden then shifts to the defendant-employer to articulate a legitimate, non-discriminatory reason for the adverse employment action." *Gowesky* at 511 (quoting *McInnis v. Alamo Community College Dist.*, 207 F.3d 276, 279-80 (5th Cir. 2000)). If the employer successfully articulates a legitimate non-discriminatory reason for the adverse employment action, "the burden then shifts back upon the plaintiff to establish by a preponderance of the evidence that the articulated reason was merely a pretext for unlawful discrimination." *Id.*

IV.    **Analysis**

As a preliminary matter, the Court notes plaintiff objects to defendant's submission of its Rule 26(f) disclosures in support of its motion for summary judgment, arguing the documents attached thereto "are not properly considered when deciding a motion for summary judgment." [Doc. 18, p.12] As the Court has in no way relied upon the Rule 26(f) disclosures in connection with this Ruling, the objection is moot.

A.     **Denial of Reasonable Accommodations**

Plaintiff argues she was subjected to unlawful discrimination by defendant, in that defendant refused to make reasonable accommodations for her physical limitations. More specifically, plaintiff argues defendant refused to accommodate her in the following ways: (1) by not moving her to a classroom closer to a restroom facility; (2) by not providing her with covered parking; (3) by not storing the copy machine paper in a location accessible to plaintiff; and (4) by forcing plaintiff to utilize the "popsicle stick method" of calling on students. [Doc. 18, pp. 14-15]

As previously noted, one form of discrimination under the ADA is "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee. . . ." 42 U.S.C.A. § 12111(5)(A). To state a prima facie claim for discrimination based on an employer's failure to accommodate a disability, plaintiff must show: "(1) the employer is covered by the statute; (2) she is an individual with a disability; (3) she can perform the essential functions of the job with or without reasonable accommodations; and (4) the employer had notice of the disability and failed to provide accommodation." *Bridges v. Dept. of Social Servs.*, 254 F.3d 71, *1 (5th Cir. 2001); *see also Mzyk v. North East Ind. School Dist.*, 397 Fed.Appx. 13, *16, n.3 (5th Cir. 2010). In the matter before this Court, only the fourth element is in dispute.

With regard to the fourth element, the Fifth Circuit has explained:

Under the ADA, it is unlawful for an employer to fail to accommodate the known limitations of an employee's disability. "An employee who needs an accommodation because of a disability has the responsibility of informing her employer." *E.E.O.C. v. Chevron Phillips Chem. Co.*, 570 F.3d 606, 621 (5th Cir. 2009). . . . "When a qualified individual with a disability requests a reasonable accommodation, the employer and employee should engage in flexible, interactive discussions to determine the appropriate accommodation." *E.E.O.C. v. Agro Distrib.*, 555 F.3d 462,

471 (5th Cir. 2009).

*Griffin v. United Parcel Service, Inc.*, 661 F.3d 216, 224 (5th Cir. 2011).  Once the employee identifies his or her disability and resulting limitations, and suggests a reasonable accommodation, "the employer is obligated by law to engage in an 'interactive process': 'a meaningful dialogue with the employee to find the best means of accommodating that disability.'"  *E.E.O.C. v. Chevron Phillips Chemical Co., LP*, 570 F.3d 606, 621 (5th Cir. 2009) (quoting *Tobin v. Liberty Mut. Ins. Co.*, 433 F.3d 100, 108 (1st Cir. 2005)); *see also Picard v. St. Tammany Parish Hosp.*, 423 Fed.Appx. 467, 470 (5th Cir. 2011). "The process thus requires 'communication and good-faith exploration.'" *Id.* (quoting *Kleiber v. Honda of Am. Mfg.*, 485 F.3d 862, 871 (6th Cir. 2007)). "[T]he responsibility for the interactive process is shared."  *Loulseged v. Akzo Nobel Inc.*, 178 F.3d 731, 736 (5th Cir. 1999).  "When an employer does not engage in a good faith interactive process, that employer violates the ADA. . . ."  *Id*; *see also Loulseged* at 736.  However, when responsibility for the breakdown of the "informal, interactive process" is traceable to the employee, the employer has not violated the A.D.A.  *Loulseged* at 736. "[T]here may be some situations in which the reasonable accommodation is so obvious that a solution may be developed without either party consciously participating in an interactive process."  *Id.*  Accordingly, "the process must thus be viewed on a case-by-case basis."  *Id.*

An accommodation is simply a change or modification of the work environment, which allows a disabled individual to participate on an equal footing with non-disabled employees.  29 C.F.R. § 1630.2(o)(1)(iii). A "reasonable accommodation" may include "acquisition or modification of equipment or devices." 42 U.S.C.A. § 12111(9) (West 2008).  However, "the ADA provides a right to *reasonable* accommodation, *not* to the employee's *preferred* accommodation." *E.E.O.C. v.*

13

*AgroDistrib.*, 555 F.3d 462, 471 (5th Cir. 2009)(emphasis added).

> The accommodation . . . does not have to be the "best" accommodation possible, so long as it is sufficient to meet the job-related needs of the individual being accommodated .... [T]he employer providing the accommodation has the ultimate discretion to choose between effective accommodations, and may choose the less expensive accommodation or the accommodation that is easier for it to provide.

*Id.* (quoting 29 C.F.R. pt. 1630, App., § 1630.9).  Furthermore, proposed accommodations involving significant expense or difficulties upon the employer's operation of its business constitute an "undue hardship" and need not be implemented.  42 U.S.C. §§ 12112(b)(5)(A), 12111(10) (West 2008).

### 1.    Access to restrooms

In the present case, plaintiff asserts she advised defendant of her need for "immediate access to bathrooms" at her first and second meetings with Ms. Ardoin, and again on at least two occasions thereafter. [Doc. 18-1, ¶¶ 2, 3, 6] Plaintiff testified she needs immediate access to a restroom, because due to her disability, once she realizes she needs to use the restroom, she does not "have the luxury of waiting" and must "get to a bathroom as quick as possible." [Doc. 15-1, pp. 28, 29] Plaintiff testified when she was shown her classroom during her first meeting with Ms. Ardoin, she told Ms. Ardoin that she "really needed to be put closer" to a restroom, but Ms. Ardoin responded there was no other available space. [Doc. 15-1, pp. 24, 25] Plaintiff further testified she inquired at least two more times, likely in October and December of 2007, as to whether a classroom closer to a restroom was available, and on both occasions was told nothing was available. [Id. at 26-27] Plaintiff contends, "As a result of [her] disability and her classroom not being in immediate proximity to a bathroom, on three occasions, [she] could not make it to the bathroom and urinated on herself." [Doc. 18-1, ¶ 9] She testified on those occasions, she had to go home to change her clothing. [Doc. 15-1, p.30] Plaintiff argues, "urinating on one's self during work, [and] being in

14

constant fear of not making it to the bathroom" impeded upon her "ability to perform the essential functions of her job." [Doc. 18, p.15]

According to defendant, when plaintiff first interviewed with Mr. Lombas, as well as when she was first interviewed by Ms. Ardoin, given her apparent disability, she was asked by each whether she would need any accommodations. Both Mr. Lombas and Ms. Ardoin testified they were told only that plaintiff would need "regular restroom breaks." [Doc. 15-3, ¶ 6; Doc. 15-4, p.14] At her deposition, Ms. Ardoin testified "all of my teachers receive regular bathroom breaks, so that wasn't any problem at all." [Doc. 15-4, p. 14] Additionally, according to Ms. Ardoin, plaintiff and her class were granted permission to use the kindergarten restroom, "which was newer and wheelchair accessible." [Doc. 15-9, ¶ 13; see also Doc. 2]   Ms. Ardoin does not specifically remember the meeting with plaintiff where she showed plaintiff her classroom, but is fairly certain that meeting did take place, as she customarily shows new teachers their classroom. [Id. at 15] Other than plaintiff stating she needed regular restroom breaks at her initial interview, Ms. Ardoin remembers no other conversations with plaintiff regarding restroom breaks until April 2008. [Id. at 16] In April 2008, plaintiff submitted a letter to Ms. Ardoin, carbon copied to the Equal Employment Opportunity Commission ("EEOC") and the School Board, wherein she advised she was having issues with her proximity to the restroom facilities. [Doc. 15-4, pp. 16-17] In response, Ms. Ardoin moved plaintiff and her class to a classroom closer to the kindergarten restroom. [Doc. 15-4, p.17] It is unclear whether or not this location remedied plaintiff's concerns.[6]

_____

[6]Plaintiff argues she could have been moved to a classroom even closer to a restroom, or to a classroom with direct bathroom access, but does not state whether or not the classroom to which she was ultimately moved was sufficient to address her limitations. [Doc. 18, p.14] (In her complaint, plaintiff asserts her original classroom was approximately 200 feet from the restroom, and her subsequent classroom was located approximately 40 feet from a restroom. [Doc. 1, ¶ ¶ 32, 37]) Plaintiff does not

15

Defendant argues, "Ms. Martel fails to demonstrate why the successful performance of her teaching duties depended on her having . . . a bathroom in the classroom . . . ." [Doc. 19-1, p.6] Defendant continues:

> [E]ven though [plaintiff] was well aware of her regular urgent need to urinate and of the results if she did not make it to the bathroom, Ms. Martel did not show that she attempted to take steps to assist herself, such as wearing protection to avoid "accidents" and/or bringing extra clothing. She argues that she had to be close to a bathroom so she could go whenever the urge hit; however, she does not address what she did with her students for whom she was responsible when this occurred nor does she state who took over her responsibility for teaching and supervising her students when the principal allowed her to go home during her work day to change clothes due to her lack of preparation for this known possibility.

[Doc. 19-1, p.7]

In this matter, the Court finds there exist the following genuine issues of material fact: (1) whether defendant was placed on notice of plaintiff's physical limitations (*i.e.* her need for "immediate access" to a restroom) in August, October and/or December of 2007, and if so, (2) whether "immediate access" to a restroom would constitute a *reasonable* accommodation, and if so, (3) whether defendant failed to accommodate plaintiff's known limitations.[7] This Court does not find defendant did, or did not, make reasonable accommodation. Rather, the Court notes sufficient

---

identify a classroom which was located closer to a restroom to which she could have been moved, and, according to the uncontested facts, the only classroom with its own restroom was utilized by "special education students . . . who had issues with toileting requiring direct access to a restroom. . . ." [Doc. 15-9, ¶ 44]

[7]If plaintiff's reasonable accommodation claim is limited to that period in time in which she was located in her original classroom, it would appear defendant is not arguing it would have suffered an "undue hardship" by moving plaintiff to a classroom closer to a restroom, in that Ms. Ardoin testified she moved plaintiff's classroom closer to a restroom shortly after receiving the April 2008 correspondence from plaintiff, and that she would have moved her classroom earlier if she had known "there was a problem." [Doc. 15-4, pp. 175-76] However, as noted, it is unclear whether plaintiff maintains her second classroom did not constitute a "reasonable accommodation," and defendant's briefing does not sufficiently address this potential issue, such that this Court could issue a ruling regarding whether plaintiff's second classroom constituted a reasonable accommodation.

factual information was either not provided, or material facts remain in dispute.

### 2.    Covered parking

Plaintiff contends she was denied a reasonable accommodation, in that her request for a covered parking space was denied.[8] According to plaintiff, "Because of her need to use a wheelchair lift and her limitation in mobility, Ms. Martel cannot quickly lower her wheelchair/scooter, lift her wheelchair/scooter, load, and unload her van." [Doc. 1 ¶ 18] Plaintiff continues, "Because of her necessary use of a wheelchair lift and limitation in mobility together with Mamou Elementary's lack of a covered parking area, when it was raining, Ms. Martel was rained on for prolonged periods." [Id. at ¶ 20]  Plaintiff contends at her first meeting with Ms. Ardoin, she specifically requested covered parking, "like an extended overhang or something, so that I could unload my scooter." [Doc. 15-1, p.24] Plaintiff testified Ms. Ardoin responded, "she'd have to check with the school board." [Id.] According to plaintiff, it was not until she submitted her April 2008 correspondence to Ms. Ardoin (carbon copied to the EEOC and the School Board), that Ms. Ardoin "put in a work order for a canopy under which Ms. Martel could park." [Doc. 18, p.7]  Plaintiff asserts "the school board received the work order but did nothing with it."[9] [Id. at 8] Plaintiff argues the school board had

---

[8]Again, all parties agree Ms. Martel "was able to park in one of only two spots located close to the school building. . . ." [Doc. 15-9, ¶ 18; Doc. 18-1]

[9]Plaintiff relies on the 30(b)(6) deposition testimony of Nason Fontentot, Maintenance Supervisor for the Evangeline Parish School System, for her position that the School Board did nothing with her request for covered parking.  At the time of the relevant events in this matter, the school board was constrained in taking certain actions or making certain expenditures, as it was subject to judicial oversight due to ongoing desegregation litigation.  *See Graham v. Evangeline Parish School Board*, Civil Action No. 65-11053 (Melançon, J.). According to Mr. Fontentot, prior to receiving the work order for covered parking for Ms. Martel, the Court had denied a request for a canopy for Ville Platte Elementary School, and had denied a request for two replacement central air units at an Evangeline Parish school. [Doc. 18-4, pp.7, 12] Accordingly, Mr. Fontentot did not inquire of the Court as to whether the school board could erect covered parking for Ms. Martel, stating "if you're gonna be denied twice, I quit asking." [Id. at 13] However, Mr. Fontenot did acknowledge the school board could spend up to a certain

authority to spend up to $3,000, without court approval, but made no effort to ascertain the cost of "constructing some sort of covered parking for Ms. Martel." [Doc. 18, p.8]

After plaintiff submitted her April 2008 correspondence to Ms. Ardoin (as well as the EEOC and the school board), "Ms. Ardoin . . . purchased a large beach umbrella which someone on the staff used to cover Martel as she entered and exited her vehicle on rainy days." [Doc. 15-9, ¶¶ 26, 30] Plaintiff argues that although the school board is of the opinion the beach umbrella constituted a reasonable accommodation, "this is certainly not the case when the Evangeline Parish School Board took absolutely no steps to address Ms. Martel's request for covered parking accommodations during the previous nine months, did not determine the costs of any covered parking options or constructions, and did not bring the request to the attention of the Judge presiding over the subject desegregation case."[10] [Doc. 18, p.14] Plaintiff argues "coming to work with drenched clothes and materials . . . impede[d] Ms. Martel's ability to perform the essential functions of her job." [Id. at 15]

Defendant asserts "that Martel did not request any specific accommodation upon initial hire and inquiry by the School Board other than for regular restroom breaks and, possibly, a covered parking space."[11] [Doc. 15-8, p.23] Defendant contends it "informed Martel of the reason for the denial, but, when she requested it again in April 2008, Ms. Ardoin purchased a large beach umbrella

_____

monetary limit (he could not recall the amount) without court approval. [Id. at 15]

[10]Although not abundantly clear, it thus appears plaintiff concedes the beach umbrella did constitute a "reasonable accommodation," and her claim for covered parking is limited to that period of time, prior to acquisition of the beach umbrella, when she had no covered parking.

[11]In its briefing, defendant does not state when it was first placed on notice of plaintiff's request for covered parking. Nevertheless, it is apparent from the materials before the Court that defendant was placed on notice of this request "at the beginning of the school year." [Doc. 15-9, ¶ 28; *see also id.* at ¶¶ 6, 9, 17, 26; Doc. 15-8, p. 24]

18

that a staff member held over her while she entered and exited her vehicle during inclement weather." [Id. at 24] Defendant further contends although the beach umbrella "was not Martel's preferred accommodation, . . . under the circumstances, [it] was a reasonable alternative." [Doc. 15-8, p.24] Defendant further argues:

> Ms. Martel fails to demonstrate why the successful performance of her teaching duties depended on her having covered parking. . . .
>
> Obviously, while not having covered parking was an inconvenience and getting wet was irritating, it did not keep her from attending work on rainy days or from performing the essential functions of her job.  This, as well as her other requests, sought accommodations for matters of her own personal convenience for things she experienced in the course of her everday life as a result of her disability - not as a result of a limitation that prevented her from performing her job or getting the same benefits as other teachers.  Such are not the type of activities for which the accommodations are required without adverse impact upon the employee's job performance.
>
> . . . Ms. Martel had the option of having someone drive her to work or asking a friend at work to assist her on rainy days.  Ms. Martel does not submit any evidence that she attempted to remedy or alleviate her rainy day problem herself but demanded instead to have the District build a covered parking space dedicated for her personal use.

[Doc. 19-1, p.7]

In this matter, the Court finds there exists a genuine issue of material fact as to whether plaintiff was denied a reasonable accommodation with regard to her request for covered parking, for that period in time prior to acquisition of the beach umbrella.  Additionally, there exists a genuine issue of material fact as to whether the request for a covered parking spot was, in fact, a matter of preference or a genuine accommodation.  Additionally, it is unclear whether once Ms. Martel identified her disability and resulting limitations[12], defendant and plaintiff engaged in an "interactive

---

[12]Defendant concedes it had knowledge of plaintiff's disability. [Doc. 15-8, p.19] Defendant does not address within its briefing whether or not it was aware of plaintiff's resulting limitations - *i.e.* her

process" or "a meaningful dialogue" in order "to find the best means of accommodating" plaintiff's disability. *E.E.O.C. v. Chevron Phillips Chemical Co., LP*, 570 F.3d 606, 621 (5th Cir. 2009). Thus, again, this Court does not rule Ms. Martel's request was or was not a request for accommodation as contemplated by the Act; rather, the Court finds it does not have sufficient information to make such a determination, or the facts remain in dispute.  Additionally, it is unclear whether defendant received notice that the request for covered parking was lodged in order to accommodate limitations resulting from plaintiff's disability, as opposed to being a mere preference.  Without knowing when notice was given and when, or if, the required interactive dialogue occurred, this Court cannot make the determination requested.  If, in fact, defendants argue no such interactive dialogue occurred precisely because Ms. Martel did not grant them notice before the 2008 letter, that fact is disputed by Ms. Martel and thus, this claim cannot be decided on a motion for summary judgment.

### 3.     Copy paper

Plaintiff asserts on two separate occasions she "requested accommodations with regard to her being able to access copy paper." [Doc. 18, p.8] More specifically, she testifies she asked Principal Ardoin and Asst. Principal Sharlene Perrodin if the copy machine paper could be moved from the assistant principal's office to the lounge where the copy machine was located, as plaintiff could not access the assistant principal's office due to her scooter. [Doc. 15-1, pp. 33-36] Plaintiff states on both occasions, her request was denied, with the reason provided being that the sodas were stored in that location and there was no where else to store the sodas. [Id.] Plaintiff testified twice thereafter she ran out of paper while trying to use the copy machine, which caused her to be late to class. [Id. at 36] On those two occasions she was able to obtain more copy paper by asking "someone

---

inability to quickly unload her scooter and school materials due to partial paralysis.

[who] came by" to bring her more copy paper. [Id.] She additionally testified she was reprimanded twice by Ms. Ardoin for being late and not having materials ready, and that on both occasions, the cause was that she could not find anyone to bring her copy paper.[13] [Doc. 15-1, pp.38-40] Plaintiff testified there was no button or lever in the copy machine area whereby she could call someone from the front office to bring paper. [Id. at 35-36]

With regard to the location of the copy paper, defendant argues, "even though Martel has not shown that she specifically requested that such be moved, Ms. Ardoin indicated . . . that others were always available at the school to obtain the paper for her since the location could not be moved due to lack of space and the need for control over how much was taken at a time." [Doc. 15-8, p. 24] Defendant further notes "Ms. Martel fails to demonstrate why the successful performance of her teaching duties depended on her having . . . immediate access to copy paper. . . ." [Doc. 19-1, p.6]

Again, this Court has question as to whether the argued request is one for genuine accommodation. Ms. Martel was, it seems, capable of traversing the route from the lounge to the entry of the office and back again. Although the Court has limited information regarding the actual process involved (as neither party has provided a full description), it would seem Ms. Martel obtained the copy paper she used in some fashion from the office. The Court notes accommodation was made whereby plaintiff could merely wave to the secretary for purposes of signing in each morning, rather than entering the office and signing the sign-in sheet, and this accommodation might have been easily modified for obtaining copy paper. Thus, it could be Ms. Martel's issue was more an issue of time management than of disability. However, this Court can only make assumptions,

---

[13]According to plaintiff, on at least one of those occasions, she had tried to make her copies the prior afternoon, but no one was available to replenish the copy paper. [Doc. 15-2, p.1]

as neither side provided the Court with sufficient factual data to make the determination requested.

In light of the foregoing, the Court finds it has not been provided sufficient factual information to make the determination requested as to whether plaintiff was denied a reasonable accommodation, such that she could timely access copy paper to prepare her class materials, and whether defendant failed to engage in an interactive process with plaintiff to determine the best means of accommodating plaintiff's disability. Again, this Court does not rule on the substantive issues presented, but rather, finds movant failed to carry its burden.

###    4.    Popsicle stick method

Plaintiff asserts "the school board forced [her] to use a popsicle stick method of calling on students."[14] [doc. 18, p.8] Furthermore, "[b]ecause of her disability, Ms. Martel could not move around the classroom and call on students with the popsicle sticks as was being required of her."[15] [Id.] Ms. Ardoin made a cloth pouch for plaintiff in which to place the popsicle sticks in an effort to accommodate plaintiff, but according to plaintiff, she was still unable to utilize the method. [Id. at 9] When plaintiff advised Ms. Ardoin she was unable to utilize the method even with the pouch, Ms. Ardoin told her she "could try it." Again, whether Ms. Martel "tried" and thereafter an interactive process was engaged in to determine alternate methods is not clear.[16] [Doc. 15-2, p.25] Thus, again, the Court finds it does not have sufficient facts to determine the issue posed, based upon the evidence and argument presented. Consequently, either there exist genuine issues of material

---

[14]Again, the "popsicle stick method" is a system utilized to ensure a teacher calls on all of their students during class. *See* note 4, *supra*.

[15]Plaintiff testified she is unable to use her left hand, and that she could not "move around the classroom and do popsicle sticks at the same time." [Doc. 15-2, p.24]

[16]It would seem a plethora of alternatives could have been explored.

fact as to whether plaintiff was denied a reasonable accommodation with regard to the manner in which she ensured she called upon all members of her class, and whether defendant failed to engage in an interactive process with plaintiff to determine the best means of accommodating plaintiff's disability, or the movant has failed to carry its burden.

### B.     Hostile Work Environment

Plaintiff asserts defendant "engaged in a pattern of abusive and harassing behavior mainly directed toward Rebecca Martel on the basis of her disability," which was "intended to discourage Plaintiff and to force her out of her employment as a teacher at Mamou Elementary." [Doc. 1, ¶ 48] To succeed on a claim of disability-based workplace harassment under the ADA, a plaintiff must demonstrate:

> "(1) that she belongs to a protected group; (2) that she was subjected to unwelcome harassment; (3) that the harassment complained of was based on her disability or disabilities; (4) that the harassment complained of affected a term, condition, or privilege of employment; and (5) that the employer knew or should have known of the harassment and failed to take prompt, remedial action."

*Gowesky v. Singing River Hosp. Systems*, 321 F.3d 503, 509 (5th Cir. 2003)(quoting *Flowers v. Southern Regional Physician Services, Inc.*, 247 F.3d 229, 235-36 (5th Cir. 2001)).  The legal standard for such a claim is high - "[f]or workplace abuse to rise to the level of an actionable offense the 'disability-based harassment must be sufficiently pervasive or severe to alter the conditions of employment and create an abusive working environment.'" *Id.* (quoting *Flowers* at 236).  Defendant argues plaintiff cannot meet the second element of her prima facie burden.

Plaintiff alleges the following actions created a hostile working environment: Plaintiff's requests for reasonable accommodations were ignored throughout the school year. [Doc. 18, p.17] Plaintiff was reprimanded for being late to class and not having materials prepared, when both

instances were caused by plaintiff not having access to copy paper. [Id.] Plaintiff was reprimanded by Ms. Adoin during the spring semester, over the intercom in front of her class, for letting a student take an exam late. [Id. at 9]  However, according to plaintiff, she had been specifically instructed by Ms. Ardoin to allow the student to come in late for testing, because the student was in a full leg cast, needed assistance with toileting, and was only coming to school that day for testing. [Doc. 15-2, pp. 47-48; Doc. 18, p.17] Plaintiff was unjustifiably placed in the Intensive Assistance Program, "which is a program meant to help teachers that needs [sic] improvement in many areas." [Doc. 18, p.9] As part of her placement in IAP, plaintiff was "forced to use a teaching method [*i.e.* the popsicle stick method] that caused her to be limited in the classroom because of her disability." [Id. at 17] After plaintiff's classroom was moved, the computers for her class "were never hooked up." [Id. at 9] On one occasion, the third graders took a field trip to the Alexandria zoo. Ms. Ardoin said it was mandatory that their teachers attend. [Doc. 15-2, pp. 17-18] However, the school bus was not handicapped accessible, and therefore, Ms. Martel would not be able to load her scooter on the bus. [Id. at 18] Accordingly, Ms. Ardoin had to drive to the zoo in her own van. [Id. at 19] Plaintiff testified Ms. Ardoin said she would see to it that plaintiff was reimbursed for mileage.  At some point thereafter, plaintiff asked Ms. Ardoin about her mileage reimbursement, and Ms. Ardoin stated "she would take care of it," however, plaintiff was never reimbursed. [Id. at 19-20]

> With regard to the inaccessibility of the copy paper and reprimands, defendant argues:
>
> [Plaintiff] admitted that she only ran out of copy paper on two (2) occasions during the school year that required her to try and get some to fill the machine and that someone came by who helped her obtain it. She further was told by both Ms. Ardoin and Ms. Perrodin that there was no other place to put it. Ms. Ardoin testified that she had no recollection of Martel ever asking her about the copy paper, but, even if she did, the paper was kept in the assistant principal's office because there was room to store it there, which also allowed the administration to have some control over how

24

it went out, as well as that there was no other place to keep the paper. She further testified that there was always someone available to obtain the paper for Martel if she needed it, including a buzzer by the copy machine that could be used to call the office for assistance.

Martel also stated that she was reprimanded on two occasions for having other teachers get the copy paper for her, but, in reality, on one occasion, Ms. Ardoin questioned her about being late to pick up her students and told her that she needed to be there on time. Martel stated she took that a reprimand, "because I was told it shouldn't happen again." The other time occurred when she did not have some materials for her class when Ms. Ardoin came in to observe her. She said Ms. Ardoin told her she needed to have her materials ready in advance and she took that as a reprimand although she admits Ms. Ardoin "wasn't yelling [and] just said it matter-of-factly."

[Doc. 15-8, pp.12-13 (footnotes omitted)]

As to the remainder of plaintiff's allegations of hostile work environment, defendant argues as follows: with regard to the computers in plaintiff's second classroom not being hooked up, plaintiff "was told when she inquired about it that a work order had been put in"; with regard to being written up for allowing a student into testing late, plaintiff "admitted that this was probably related to the testing rules." [Doc. 15-8, pp. 17-18] Defendant concludes its argument as follows:

Even assuming that every incident of which Ms. Martel complains actually occurred as she remembers, the evidence submitted does not demonstrate that her "workplace [was] permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of ... employment and create an abusive work environment." While Ms. Martel may have, in her opinion, been treated unfairly, nothing of which she complains rises even to the level of those situations which the Fifth Circuit Court of Appeals has deemed to not constitute a hostile work environment. The School Board is entitled to judgment as a matter of law on this claim.[17]

_____

[17]Defendant relies upon an opinion from the Western District of Texas for its position that plaintiff's complaints do not rise "to the level of those situations which the Fifth Circuit Court of Appeals has deemed to not constitute a hostile work environment." [Doc. 29, p.3] *See St. Cyr v. Napolitano*, 2011 WL 4964104 (W.D.Tx.) and cases cited therein.  However, the Court finds that case to be distinguishable on its facts.

[Doc. 29, p.3 (footnotes omitted)]

The Court finds, on the facts presented, there exists a genuine issue of material fact as to whether plaintiff was subjected to a hostile work environment, primarily as to whether the reasons provided by defendant for its actions are "legitimate non-discriminatory reason[s] for the adverse employment action[s]," or whether the reasons offered are "merely a pretext for unlawful discrimination." *Gowesky* at 511.

## C.    Disparate Treatment

Plaintiff asserts she was subjected to "disparate treatment," in that she was treated less favorably than non-disabled employees. A plaintiff alleging a claim under the ADA for disparate treatment must show: "(1) he or she suffers from a disability; (2) he or she is qualified for the job; (3) he or she was subject to an adverse employment action; and (4) he or she . . . was treated less favorably than non-disabled employees." *Daigle v. Liberty Life Ins. Co.*, 70 F.3d 394, 396 (5th Cir. 1995); *see also Burch v. Coca-Cola Co.*, 119 F.3d 305, 320 (5th Cir. 1997). "[A]dverse employment actions include only ultimate employment decisions such as hiring, granting leave, discharging, promoting, or compensating." *McCoy v. City of Shreveport*, 492 F.3d 551, 559-60 (5th Cir. 2007). "Under the ADA, 'discrimination need not be the sole reason for the adverse employment decision, [but] must actually play a role in the employer's decision making process and have a determinative influence on the outcome.'" *Pinkerton v. Spellings*, 529 F.3d 513, 519 (5th Cir. 2008) (quoting *Soledad v. U.S. Dept. of Treasury*, 304 F.3d 500, 503 (5th Cir. 2002)). Defendant argues plaintiff cannot meet the third and fourth elements of her prima facie burden. [Doc. 15-8, p.18]

In this matter, plaintiff argues the same actions that created a hostile work environment also constitute adverse employment actions, namely: plaintiff's requests for accommodations were denied

26

without cause; she was "forced to use a teaching method that caused her to be limited in the classroom because of her disability"; she was "placed in an Intensive Assistance program and given unsatisfactory scores without just cause"; Ms. Ardoin threatened "to write Ms. Martel up for being late to pick up her students when Ms. Martel was late because she was going around the school looking for someone to get copy paper for her"; plaintiff was reprimanded "for not having materials prepared for class because of her inability to access the copy paper"; plaintiff was reprimanded for letting a child into testing late, when she had specifically been instructed by Ms. Martel to do so; after her classroom was moved, her classroom computers "were never hooked up"; "Ms. Martel asked for handicap provisions to allow her to ride on the bus to a mandatory field trip to the Alexandria Zoo, was not provided with these provisions, had to drive herself, asked for reimbursement, and was never reimbursed." [Doc. 18, pp. 17-18] Plaintiff concludes her argument as follows:

> The ability to utilize technology in the classroom, the ability to not be ostracized from the remainder of the school personnel and children on a field trip, the ability to teach freely, the ability to follow your principal's instructions and not be reprimanded for it—these all relate to and affect conditions of a teacher's employment.

[Doc. 18, p.18]

The only action cited by plaintiff which might arguably constitute an "adverse employment action," as that term is defined in the jurisprudence, is her placement in the Intensive Assistance Program from February to May of 2008. [Doc. 15-9, ¶¶ 24, 25] Plaintiff argues the inference can be drawn that she was placed in intensive assistance due to disability discrimination, because: there were only "two possible instances where Ms. Martel was purportedly identified as not teaching properly," and, as "a seasoned, tenured teacher, two instances giving rise to concern were certainly

not just cause for placing Ms. Martel into the IAP and blemishing her permanent teaching record." [Doc. 18, p.17] Plaintiff further argues, "it is certainly a possibility that Ms. Martel was placed in the IAP in an attempt to divert her attention from the Evangeline Parish School Board's failure to respond to Ms. Martel's requests for accommodation." [Id. at 18]

In *Hernandez v. Muns*, the Fifth Circuit held that the placement of an employee on a "performance improvement plan" or "PIP," which was "a plan designed to assist employees improve their job performance over a period of time," did not constitute an adverse employment action.[18] 101 F.3d 698, *2, 6-7 (5th Cir. 1996). The Fifth Circuit reasoned plaintiff's placement on the PIPs "did not cause her to lose job duties, hours, wages, benefits, or in any way adversely affect other terms or conditions of her employment." *Id.* at *6. Like the IAP program, "the PIPs were designed to *assist* [plaintiff] in recognizing areas which needed improvement."[19] *Id.* In light of the foregoing, the Court finds summary judgment is warranted with regard to plaintiff's claim of disparate treatment, as she has failed to show she suffered an "adverse employment action," as defined under Fifth Circuit jurisprudence. Thus, defendant's motion as to this issue is GRANTED.

## V.    Conclusion

In light of the foregoing, the motion for summary judgment [Doc. 15] is GRANTED IN PART and DENIED IN PART. The motion is GRANTED to the extent it seeks dismissal of

---

[18]Like Ms. Martel, the plaintiff in *Hernandez* was placed in the assistance program on two occasions, for a period spanning several months.

[19]employment action, plaintiff has failed to establish, by a preponderance of the evidence, that the The Court notes that even if it were to assume placement of Ms. Martel in the IAP program constituted an adverse  reason provided by defendant for plaintiff's placement in the program - namely, that after observation by three school officials, it was determined that plaintiff "needed additional assistance in order to help her achieve satisfactory marks in all areas" - is merely a pretext for unlawful discrimination. *See Gowesky* at 511.

28

plaintiff's claim for disparate treatment; the motion is DENIED to the extent it seeks dismissal of

plaintiff's claims of hostile work environment and failure to provide reasonable accommodations.

THUS DONE AND SIGNED in Chambers, Lafayette, Louisiana, this ___2 1___ day of

August, 2012.

REBECCA F. DOHERTY
UNITED STATES DISTRICT JUDGE

29